# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53412-6-II |
| Respondent, | |
| v. | |
| | UNPUBLISHED OPINION |
| WILLIAM HOWARD WITKOWSKI, | |

SUTTON, A.C.J. — William Howard Witkowski appeals his multiple felony convictions.[1] He argues that *Ferrier*[2] warnings were required prior to two sheriff's deputies entering the curtilage of his property to execute a search warrant, and because these warnings were not given his convictions should be reversed. Witkowski also argues for the first time on appeal that the second search warrant was not valid because it was not signed until several days after the court authorized it.

---

[1] Witkowski appeals his convictions for one count of unlawful possession of a controlled substance with intent to deliver (heroin), one count of unlawful possession of a controlled substance with intent to deliver (methamphetamine), twelve counts of first degree unlawful possession of a firearm, one count of unlawful possession of a controlled substance (oxycodone), and seven counts of unlawful possession of a stolen firearm. Witkowski does not appeal his conviction for one count of third degree defrauding a public utility.

[2] *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

We hold that the trial court erred by concluding that *Ferrier* warnings were not required.[3] Because *Ferrier* warnings were required prior to the entry onto the curtilage of the property, we remand to the trial court to determine which portions of the search warrant should be excised, and whether sufficient probable cause exists for the search warrant following that excision. We further hold that as to Witkowski's argument raised for the first time on appeal, that the second search warrant was invalid, he fails to raise a manifest constitutional error, and thus, we decline to address this issue.

FACTS

I. BACKGROUND

In October 2015, Pierce County Sheriff's Deputy Martin Zurfluh was following up on investigations that other patrol deputies had begun. Deputy Zurfluh had been contacted by Detective Kyle Torgerson, who said that Witkowski and Tina Berven were stealing power from a public utility power provider. Deputy Zurfluh also learned that there may be a stolen all-terrain vehicle (ATV) on the property.

On October 26, Deputy Zurfluh contacted Kenneth Klotz, the general manager of the power company. Klotz informed him that the power bill for the residence was in Berven's name. Klotz also told the deputy that Witkowski also lived at the residence.

Klotz told Deputy Zurfluh that a field technician, James Field, from the power company had gone to the residence on October 6. Field "saw that the power meter that belonged at that residence was on the ground at the base of the power pole and there was a stolen meter, or a

---

[3] Based on our holding, we decline to consider Witkowski's Statement of Additional Grounds claim.

different meter, in its place." Verbatim Report of Proceedings (VRP) (Aug. 30, 2016) at 14. Field took photographs of everything, went back to his office, and later returned to the residence. When Field returned, "[h]e saw that the meter that was on the pole, that was found to be stolen, had been removed and the original one was down below still." VRP (Aug. 30, 2016) at 15. The meter down below was "the original assigned power meter assigned to that residence." VRP (Aug. 30, 2016) at 15. Klotz and Field were able to determine that the stolen meter that Field observed on October 6 belonged on a temporary service location a couple of miles away from the residence. The stolen meter was identified by serial number.

## A. THE INITIAL ENTRY ONTO THE CURTILAGE

Klotz advised Deputy Zurfluh that there "was a little more than $8,000 in . . . stolen power costs, the meter, service calls, [and] several things that were established in that bill." VRP (Aug. 30, 2016) at 23-24. After receiving this information from Klotz on October 26, Deputy Zurfluh went to the residence along with Field and two other deputies. Deputy Zurfluh testified that he went there "to discuss with Mr. Witkowski and Ms. Berven about the stolen power, and, also, try to locate the stolen power meter." VRP (Aug. 30, 2016) at 18-19.

Deputy Zurfluh, Field, and the other deputies parked in front of the gate at the residence. When Deputy Zurfluh had initially drove by, the gate to the property was open. Berven drove up to the property and got out of the car to retrieve the mail. As he approached, Deputy Zurfluh noticed that the curtilage adjacent to the residence was enclosed by a 6 to 8 foot fence and that the access gate was now locked. Deputy Zurfluh testified that he told Berven that they needed to speak with the residents about the stolen power and, although she was quite upset, Berven "opened the

3

gate" and let them onto the property.  VRP (Aug. 30, 2016) at 20-21.  Deputy Zurfluh did not give Berven any *Ferrier* warnings.  Berven confirmed this course of events in her testimony.

B.  VIEWING THE POWER POLE AND GENERATOR

After Berven opened the locked gate in the driveway, she allowed the deputies and Field onto the property, they "all walked over towards the power pole, which is located kind of in the center of the property, she just went with us."  VRP (Aug. 30, 2016) at 22.  Witkowski came onto the front porch when Berven called him.  He did not object to the deputies or ask them to leave the property.

The power meter was attached to the base of the power pole on the property, but it could not be seen from the street because the power pole was behind the residence.  Deputy Zurfluh observed that the power pole had no power meter hooked up on the pole itself.  There was a power meter at the base of the pole ("just lying there"), which Field identified as belonging to the property.  VRP (Aug. 30, 2016) at 24.  That meter was not hooked up to the electricity pole.  There was a big commercial generator hooked up to the electrical leads coming out of the pole.  Berven told Deputy Zurfluh that Witkowski was an electrician and that he had hooked up the generator to the pole.  While standing at the power pole, Deputy Zurfluh observed a red and black ATV inside of a tent like structure which was partially open which matched the description of the stolen ATV reported to him by Detective Torgerson.

A few days later, the deputies requested a search warrant for the stolen power meter.  The search warrant affidavit contained the information Deputy Zurfluh received from Field, including Field's two visits to the property.  The affidavit also contained information about the October 26 visit to the property.

4

The search warrant was served on October 29. Deputies searched a black BMW on the premises and found suspected heroin, a scale, suspected oxycodone pills, suspected methamphetamine, and crib notes. While searching the house, the deputies discovered evidence suggesting there might be controlled substances and illegal firearms on the premises.

## C.  SECOND SEARCH WARRANT

Based on information obtained on the property when executing the first search warrant, the deputies requested and obtained a second search warrant related to the suspected illegal drugs and firearms. The trial judge authorized this search warrant during a telephonic hearing on October 29, 2015, and signed the warrant on November 2. During the execution of the second search warrant, the deputies seized numerous firearms and later determined that seven of the firearms were stolen.

## II.  PROCEDURAL HISTORY

The State charged Witkowski with multiple felonies arising from drug and firearms evidence seized during the execution of the two search warrants on the property.

Witkowski filed a CrR 3.6 motion to suppress the drug and the firearms evidence seized on his property, arguing that the evidence should be suppressed because the deputies failed to give *Ferrier* warnings before entering the property on October 26.[4] The trial court entered the following relevant findings as to the initial entry and *Ferrier* warnings:

---

[4] The trial court initially suppressed the firearms found in the locked gun safe in the house which were not included in an addendum to the search warrant. The State appealed the suppression order and we reversed. *State v. Witkowski*, 3 Wn. App. 2d 318, 415 P.3d 639 (2018).

No. 53412-6-II

THE UNDISPUTED FACTS

. . . .

7.      After speaking with Klotz, Deputy Zurfluh went to the property with two other deputies and James Field.  The purpose for going to the property was to speak with Berven and Witkowski about the theft of power and the stolen power meter.

. . . .

FINDINGS AS TO DISPUTED FACTS

. . . .

3.      The [c]ourt finds Deputy Zurfluh's testimony credible that the deputies were not at the property to search.

. . . .

REASONS FOR ADMISSIBILITY OR INADMISSIBILITY OF THE EVIDENCE

. . . .

2.      This was not a knock and talk procedure, there[fore] *Ferrier* warning were not required for entry onto the property.  The deputies were not there to search but rather to talk with the occupants regarding the theft of power.

CP at 41, 45.

The trial court found that the deputies and Field did not enter onto the residence curtilage for the purpose of conducting a search, but only to talk to the occupants about the alleged theft of power on the property.  The court stated, "The officers expressed a desire to talk about this, not necessarily to search, I don't find this to be analogous to the knock and talk scenario."  VRP (Aug. 31, 2016) at 80.  This is also reflected in the trial court's written findings.

A jury convicted Witkowski as charged.  Witkowski appeals his convictions.

ANALYSIS

I. LEGAL PRINCIPLES

Article I, section 7 of the Washington Constitution states that "[n]o person shall be disturbed in his private affairs . . . without authority of law."  CONST. art. I, § 7.  The term "authority

6

of law" refers to a valid warrant, subject to limited exceptions, relevant here is the exemption for consent. *State v. Cornwell*, 190 Wn.2d 296, 301, 412 P.3d 1265 (2018).

*Ferrier* warnings are required when the police request entry into a residence to obtain consent to conduct a warrantless search. *State v. Budd*, 185 Wn.2d 566, 573, 374 P.3d 137 (2016). *Ferrier* is limited to a specific type of police procedure, a "knock and talk" procedure.

> During a knock and talk, officers go to a home without a warrant and ask for the resident's consent to search the premises. When officers conduct a knock and talk, they must give the resident a prescribed set of warnings, informing the resident of his or her constitutional rights.

*Budd*, 185 Wn.2d at 573 (internal citation omitted).

We review a trial court's findings regarding whether *Ferrier* warnings were required to be given to determine whether they are supported by substantial evidence, in the same manner as any other findings of fact. *See Budd*, 185 Wn.2d at 578.

## II. *FERRIER* WARNINGS

Witkowski argues that *Ferrier* warnings were required prior to entry onto the curtilage of his property because the deputies' purpose was to search for evidence of a crime. We agree.

Witkowski challenges the trial court's findings of fact, that Deputy Zurfluh's purpose was to question the occupants, not to search for evidence of a crime, and argues that they are not supported by substantial evidence. He further contends that these findings do not support the court's conclusion of law that *Ferrier* warnings were not required. We agree.

Deputy Zurfluh initially testified to his intent to search: "Well, to discuss with Mr. Witkowski and Ms. Berven about the stolen power, and, also, *try to locate the stolen power meter*." VRP (Aug. 30, 2016) at 18-19 (emphasis added). On cross examination, Deputy Zurfluh admitted

7

that his intent as to search for evidence of a stolen power meter. The court's findings, that the deputies' purpose to enter the property was only to question Witkowski and Berven about alleged stolen power, and not to search for evidence of a stolen power meter, are not supported by substantial evidence. Deputy Zurfluh did not merely seek to question or gain information from the occupants; rather, he sought to look at the power pole to search for evidence of utility theft.

We reject the State's suggestion that *Ferrier* does not apply when officers enter the closed curtilage of a home. The State cites no authority to support this contention. Accordingly, we hold that the trial court's findings of fact regarding this issue are not supported by substantial evidence and they do not support the trial court's conclusion of law that *Ferrier* warnings were not required to be given prior to the deputies' entry onto the curtilage of the property.

### III. SECOND SEARCH WARRANT

For the first time on appeal, Witkowski argues that the second search warrant was invalid because it was not signed by the authorizing court until several days after the search. Because this issue is not a manifest constitutional error under RAP 2.5(a)(3), we decline to consider it further.

Application of RAP 2.5(a)(3) depends on the answers to two questions: "(1) [h]as the party claiming error shown the error is truly of a constitutional magnitude, and if so, (2) has the party demonstrated that the error is manifest?" *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). Witkowski argues that noncompliance with CrR 2.3(c) is a manifest constitutional error.

But Witkowski failed to raise this argument below, and had he done so, a factual record could have been developed. Based on this record, Witkowski has not demonstrated a manifest constitutional error. Thus, we decline to review this issue.

IV. REMEDY

The State argues that this matter should be remanded so that the trial court can determine, after excising the information from the warrant affidavit that was garnered from the unlawful entry into the curtilage, whether the search warrant is nevertheless supported by probable cause. We agree that this is the appropriate remedy.

A search warrant remains valid even where the search warrant affidavit contains information that cannot be considered by the magistrate if, after excising the impermissible information from the affidavit, probable cause remains to support the warrant. *State v. Eserjose*, 171 Wn.2d 907, 928, 259 P.3d 172 (2011). Here, because the October 26, 2015 entry was unlawful, any information related to that entry must be excised from the search warrant affidavit for the first warrant. The trial court then must determine whether probable cause exists for the first warrant without the excised information.

Witkowski argues that without the information from the October 26 visit, the information in the warrant affidavit was stale. Because the trial court has not previously considered staleness, Witkowski will be able to make this argument on remand.

If the trial court determines that the remaining facts in the warrant affidavit were not stale, and concludes that the warrant affidavit for the first search warrant establishes probable cause even after the information from the October 26 visit is excised, the trial court's decision to deny the motion to suppress the evidence found pursuant to both search warrants will be upheld. If the trial court determines that probable cause does not support the first search warrant after the information

from the October 26 visit is excised or that the warrant affidavit was stale, the evidence found pursuant to both search warrants must be suppressed.[5]

CONCLUSION

We hold that the trial court erred by concluding that *Ferrier* warnings were not required. Because *Ferrier* warnings were required prior to the entry onto the curtilage of the property, we remand to the trial court to determine which portions of the search warrant should be excised, and whether sufficient probable cause exists for the search warrant following that excision. We further hold that as to Witkowski's argument raised for the first time on appeal, that the second search warrant was invalid, he fails to raise a manifest constitutional error, and thus, we decline to address this issue.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
SUTTON, A.C.J.

We concur:

_____
MAXA, J.

_____
CRUSER, J.

---

[5] Witkowski is free to raise, on remand, the continued validity of his conviction for unlawful possession of a controlled substance (oxycodone) in light of *State v. Blake*, No. 96873-0, 2021 WL 728382 (Wash. Feb. 25, 2021): http://www.courts.wa.gov/opinions/pdf/968730.pdf